432 A.2d 212
**COMMONWEALTH of Pennsylvania, Appellant,**
**v.**
**Paul MINTON, Catherine J. Smith and Joseph Scarlata.**
Superior Court of Pennsylvania.
Argued Sept. 8, 1980.
Filed April 3, 1981.
Reargument Denied July 17, 1981.
Reargument En Banc Denied Sept. 4, 1981.

Vram Nedurian, Jr., Assistant District Attorney, Media, for Commonwealth, appellant.

Theodore Simon, Philadelphia, for Minton, appellee.

Carmen P. Belefonte, Media, for Smith and Scarlata, appellees.

Before WICKERSHAM, HOFFMAN and VAN der VOORT, JJ.

WICKERSHAM, Judge:

This is an appeal by the Commonwealth from the lower court's order granting appellees' motions to suppress.[1] We reverse.

The facts underlying this appeal may be summarized as follows. On April 1, 1979, an undercover narcotics investigator for the Pennsylvania State Police obtained a warrant from a district magistrate to search a residence located at 309 East Springfield Road in Springfield Township, Pennsylvania. The warrant stated that the residence was possessed by Mr. and Mrs. Joseph Scarlata and that the items to be searched for were marijuana, narcotics paraphernalia, records, and monies of drug transactions. The warrant was executed, and, as a result of their search of the residence, the police seized approximately four hundred and two pounds of marijuana, a couple thousand grams of hash oil,

---

1. This appeal is properly brought by the Commonwealth because it involves pure questions of law, and the suppression order results in the effective termination of the prosecution. *Commonwealth v. Davis*, 270 Pa.Super. 202, 411 A.2d 250 (1979); *Commonwealth v. Kunkel*, 254 Pa.Super. 5, 385 A.2d 496 (1978).

some hash and some cocaine. Appellees were present when the warrant was executed, and were arrested and charged by criminal information with criminal conspiracy, possession of controlled substances and possession with intent to deliver controlled substances. Appellees filed pretrial motions to suppress, and, after a hearing, the lower court entered an order suppressing all physical evidence secured by the Commonwealth, all statements made by appellees and all fruits from the search of the residence.

In their pretrial motions to suppress, appellees argued that all evidence obtained as a result of the search should be suppressed because the affidavit accompanying the search warrant did not establish probable cause. The lower court agreed.

In the order to support a valid search warrant, an affidavit must provide a magistrate with information sufficient to persuade a reasonable person that there is probable cause for a search. *Commonwealth v. Davis*, 466 Pa. 102, 351 A.2d 642 (1976); *Commonwealth v. Stamps*, 260 Pa.Super. 108, 393 A.2d 1035 (1978). While we have held that more evidence is needed than would constitute mere suspicion and conjecture, it is only the probability and not a prima facie showing that is required. *Commonwealth v. Blakney*, 261 Pa.Super. 220, 396 A.2d 5 (1978). In determining whether an affidavit is sufficient to support a search warrant, we recognize

> . . .; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, . . .; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, . . .; and that their determination of probable cause should be paid great deference by reviewing courts, . . . .

*Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637, 645 (1969), (citations omitted).

> [Additionally] affidavits for search warrants, such as the one involved here, must be tested and interpreted by

magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*　*　*　*　*　*

[And] when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States*, supra 362 U.S. [257] at 270, [80 S.Ct. 725 at 735–36], 4 L.Ed.2d [697] at 707, 78 A.L.R.2d 233.

*United States v. Ventresca*, 380 U.S. 102, 108–109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965).

The affidavit of probable cause which accompanied the search warrant in the instant case is set forth in its entirety as follows.

On 27 March 1979, I the affiant received information from Lt. Robert DUKES, Springfield Twp., Delaware County, Police Dept., that his department had received complaints concerning 309 E. Springfield Rd., in reference to large amounts of traffic arriving at this residence during the day and night.

On 27 March 1979, I the affiant met with Lt. DUKES in reference to the abovementioned residence. Lt. DUKES related that the residence is leased by Mr. & Mrs. Joseph SCARLATA. Lt. DUKES related that members of the Springfield Twp. Police Dept. periodically have been conducting surveillance of this residence for the past two (2) months and have observed numerous vehicles arrive and

depart this residence, many of these vehicles having New York and New Jersey registrations. Lt. DUKES then supplied the affiant with a list of vehicle registration numbers that were observed at the SCARLATA residence during the past two (2) months. Vehicles registered to the following list of persons are among the registrations that were ascertained by Springfield Twp. Police Dept.

1. Anthony OTERI
2. Salvatore STRAMPELLO
3. Dennis DIAMOND
4. Jack BAILEY

The four (4) abovementioned subjects have been arrested in the past for Drug Violations.

On 28 March 1979, I the affiant received from Lt. DUKES, an anonymous letter that was mailed to the Chief of Police, Springfield Twp. P.D., postmarked 24 March 1979 and received at Springfield Twp. P.D. on 26 March 1979. This letter had reference to the Joseph SCARLATA residence and the letter related that a large shipment of marijuana was to arrive at the Joseph SCAR-LATA residence within the next few days.

On 28 March 1979, I the affiant conducted a Police records check of Joseph SCARLATA, this check revealed that Joseph SCARLATA was arrested four (4) times for Violations of the Drug Act.

On 28 March 1979, I the affiant contacted Special Agent Don Miller of the Drug, Enforcement Administration. S. A. MILLER related that Joseph SCARLATA has been documented in D.E.A. files and is known to be engaged in major drug trafficking.

On 28 March 1979, I the affiant contacted Tpr. Thomas L. STERN of the Region II Narcotic Strike Force in Reading, Penna., in reference to Joseph SCARLATA. Tpr. STERN related intelligence information on Joseph SCARLATA was supplied to the Region II office via Tpr. Robert LAKE, Delaware State Police, Narcotics Unit.

On 28 March 1979, I the affiant contacted Tpr. Robert LAKE, Delaware State Police, narcotics unit. Tpr. LAKE

related that he is presently conducting a narcotics investigation and Joseph SCARLATA is involved in the investigation.

On 29 March 1979, I the affiant conducted a surveillance of the Joseph SCARLATA residence between the hours of 2100 to 2230. During this period of surveillance, five (5) vehicles were observed arriving at this location, 309 E. Springfield Rd. The occupants of these vehicles would go into the residence, stay for a few minutes, and then would depart this location. During the period of surveillance a large plastic trash bag was observed sitting at the curb side directly in front of the SCARLATA residence. At 2230 hrs., I the affiant removed this bag and transported it to the Franklin Center State Police barracks, and conducted a search of the contents. Contained in the bag was a letter addressed to Mr. and Mrs. Joseph SCARLATA at 309 E. Springfield Twp. Also in the trash bag was a large green plastic bag containing marijuana residue. I the affiant conducted a field test of the residue in the bag and received a positive reaction for the presence of marijuana.

On 30 March 1979, I the affiant contacted a confidential and reliable informant in reference to this case. The informant related that he knows of Joseph SCARLATA to be a marijuana dealer. This informant also related that he, Joseph SCARLATA is a shrewd dealer of marijuana, that he gets his shipment in one day and has it all sold within a couple of days. This confidential informant has been reliable in the past and supplied the Penna. State Police with information that resulted in five (5) arrests and convictions in Delaware County Court.

On 30 Mar 79, I the affiant conducted a surveillance of the Joseph SCARLATA residence at 309 E. Springfield Rd. Delaware County. This surveillance was conducted between the hours of 2100 hrs. and 2200 hrs. During this surveillance a vehicle registered to Steven M. DOUGHERTY arrived at this residence. A Police Record Check reveals that Steven M. DOUGHERTY was arrested by Phila P.D. for Possession of a controlled Substance.

On 31 Mar 79, I the affiant conducted a surveillance of the Joseph SCARLATA residence during the hours of 2030 hrs. and 2300 hrs. During this period of surveillance (4) four vehicles were observed arriving at the SCARLATA residence. I the affiant observed several males carrying large plastic trash bags from the first floor of this residence to the second floor. The bags that were observed by the affiant were exactly the same as the bag that was found in SCARLATA's trash on 29 Mar 79.

Due to the facts that some of the traffic that was observed at this residence after 2200 hrs. and the confidential informant related that Joseph SCARLATA sells marijuana within a short period of time, I the affiant requests that this search warrant may be served during the hours of darkness.

██ In its evaluation of the affidavit, the lower court considered the allegations of fact contained therein in seriatim fashion and excluded each from its determination of probable cause. The lower court concluded that since "[e]ach allegation of fact advanced in support of finding probable cause fails after analysis . . . the court [has] no recourse other than to affirm its . . . finding that the district justice had insufficient legal grounds to issue a search warrant." (Lower court's opinion at 11). We believe that the lower court's seriatim evaluation of the facts alleged in the search warrant was improper. In *Commonwealth v. Bryant*, 247 Pa.Super. 386, 390, 372 A.2d 880, 881 (1977), we held that "[i]t is possible that no one portion of the affidavit would supply probable cause . . . , however, the determination of probable cause should be made from a consideration of the affidavit in its entirety." Of course, consideration of individual allegations of fact may be necessary in certain circumstances. For example, where an allegation may involve a misstatement of fact, *Commonwealth v. Scavincky*, 240 Pa.Super. 550, 359 A.2d 449 (1976); facts derived through exploitation of illegal police conduct, *Commonwealth v. Shaw*, 476 Pa. 543, 383 A.2d 496 (1978); facts not closely related in time to the date the warrant is issued,

*Commonwealth v. Shaw,* 444 Pa. 110, 281 A.2d 897 (1971); and facts obtained from an informant which are necessary to a finding of probable cause, *Spinelli v. United States, supra,* individual consideration has been deemed appropriate.

One of the allegations contained in the instant affidavit which may warrant individual consideration is set forth as follows.

On 29 March 1979, I the affiant conducted a surveillance of the Joseph SCARLATA residence between the hours of 2100 to 2230....

During the period of surveillance a large plastic trash bag was observed sitting at the curb side directly in front of the SCARLATA residence. At 2230 hrs. I the affiant removed this bag and transported it to the Franklin Center State Police barracks, and conducted a search of the contents. Contained in the bag was a letter addressed to Mr. and Mrs. Joseph SCARLATA at 309 E. Springfield Twp. Also in the trash bag was a large green plastic bag containing marijuana residue. I the affiant conducted a field test of the residue in the bag and received a positive reaction for the presence of marijuana.

As to this allegation, the lower court expressed serious doubt that the seizure of the trash bag was legal. The lower court cited *People v. Krivda,* 5 Cal.3d 357, 96 Cal.Rptr. 62, 486 P.2d 1262 (1972), vacated 409 U.S. 33, 93 S.Ct. 32, 34 L.Ed.2d 45 (1972), reaff'd, 8 Cal.3d 623, 105 Cal.Rptr. 521, 504 P.2d 457 (1973), cert. denied, 412 U.S. 919, 93 S.Ct. 2734, 37 L.Ed.2d 145 (1973), in which the California Supreme Court held that the placement of one's trash onto the sidewalk for collection is not an abandonment of their expectation of privacy. The California court also noted that many municipalities have carefully regulated the right to collect and haul away trash which, it concluded, refutes the view that one's trash becomes public property when placed on the sidewalk for collection.

Appellees maintain that they had a reasonable expectation of privacy that their discarded trash would not be searched. They assert that the reasoning articulated by the California

Supreme Court in *Krivda* is particularly applicable to the facts of the instant case because the disposal of trash and its collection in Springfield Township are strictly regulated by the Springfield Township Code. In particular, appellees cite § 54–12–C of the township code which provides that:

It *shall be unlawful for any person, other than the occupants* of the residence, building and/or dwelling upon which the refuse receptacles are stored, or the collector, *to remove covers of any of the contents of the refuse receptacles.* (Emphasis supplied by appellees).

■ We prefer the view adopted by every United States Court of Appeals to consider the issue [2], that placing trash for collection is an act of abandonment which terminates any fourth amendment protection. In *United States v. Shelby*, 573 F.2d 971 (7th Cir. 1978), cert. denied 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978), the court stated that:

Perhaps the defendant did in fact believe that the incriminating evidence of his crime so disposed of would go undetected. If defendant did, we view it only as additional bad judgment on his part. In the real world to so view the status of one's discarded trash is totally unrealistic, unreasonable, and in complete disregard of the mechanics of its disposal. In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment. Defendant may have decided to assume the risk, calculating no one would think to

2. *United States v. Vahalik*, 606 F.2d 99 (5th Cir. 1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980); *United States v. Crowell*, 586 F.2d 1020, (4th Cir. 1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *United States v. Shelby*, 573 F.2d 971, (7th Cir. 1978), cert. denied, 439 U.S. 841, 99 S.Ct. 132, 58 L.Ed.2d 139 (1978); *Magda v. Benson*, 536 F.2d 111, (6th Cir. 1976) (per curiam); *United States v. Mustone*, 469 F.2d 970 (1st Cir. 1972); *United States v. Dzialak*, 441 F.2d 212 (2nd Cir. 1971), cert. denied, 404 U.S. 883, 92 S.Ct. 218, 30 L.Ed.2d 165 (1971). See *United States v. Alden*, 576 F.2d 772, (8th Cir. 1978), cert. denied 439 U.S. 855, 99 S.Ct. 167, 58 L.Ed.2d 161 (1978); *United States v. Minker*, 312 F.2d 632, (3rd Cir. 1962), cert. denied 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963).

search in his garbage can, or he may have been careless, but whatever his reason he evidenced an intent in a convenient but risky way to permanently disassociate himself from the incriminating contents.

*Id.* at 973.

A local ordinance similar to the one in the instant case was involved in *United States v. Vahalik*, 606 F.2d 99 (5th Cir. 1979), cert. denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980). In *Vahalik*, the court held that the purpose of the ordinance was presumably sanitation and cleanliness not privacy.

 In any event, the lower court excluded the allegation concerning the trash bag from its consideration of the affidavit because it found that it lacked probative value. The lower court made the following finding of fact in its order granting appellees' motion to suppress:

On March 29, 1979, the affiant observed a large plastic trash bag situated on the curb directly in front of the subject premises. The affiant took the bag and transported same to headquarters where a search of the bag yielded, inter alia, another plastic trash bag which contained marijuana residue.

Absent any information as to how the trash bag got to the curb and who placed it there, along with the innumerable possibilities of who placed the trash bag within the trash bag, this Court cannot assign probative value to the affiant's discovery.

(Lower court's order at 4–5).

In its opinion the lower court stated that:

absent any information as to how the trash bag got to the curb and who placed it there, the allegation set forth in paragraph (h) did not establish a sufficient basis to conclude that said bag emanated from the premises sought to be searched.

(Lower court opinion at 7).

The lower court's findings ignore the additional fact alleged in the affidavit that the trash bag contained a letter ad-

dressed to Mr. and Mrs. Joseph Scarlata at 309 East Spring-field Twp. The lower court does not inform us of its reason for omitting mention of the letter, but we believe that the letter, combined with the fact that the trash bag was discovered directly in front of the Scarlata residence, is extremely persuasive that the trash bag emanated from that residence. Whether a fact has probative value or not involves a question of whether it may be regarded as evidential or relevant. See 1 J. Wigmore, Wigmore on Evidence, § 11 (3rd ed. 1940). It is well settled that a fact is relevant if it tends to make a fact at issue more or less probable. *Commonwealth v. Scott*, 480 Pa. 50, 389 A.2d 79 (1978). The discovery of the trash bag and its contents in the instant case clearly had probative value.

Two other allegations which may warrant individual consideration involve facts obtained from informants and are set forth as follows:

On 28 March 1979, I the affiant received from Lt. DUKES, an anonymous letter that was mailed to the Chief of Police, Springfield Twp. P.D., postmarked 24 March 1979 and received at Springfield Twp. P.D. on 26 March 1979. This letter had reference to the Joseph SCARLATA residence and the letter related that a large shipment of marijuana was to arrive at the Joseph SCAR-LATA residence within the next few days.

On 30 March 1979, I the affiant contacted a confidential and reliable informant in reference to this case. The informant related that he knows of Joseph SCARLATA to be a marijuana dealer. This informant also related that he, Joseph SCARLATA is a shrewd dealer of marijuana, that he gets his shipment in one day and has it all sold within a couple of days. This confidential informant has been reliable in the past and supplied the Penna. State Police with information that resulted in five (5) arrests and convictions in Delaware County Court.

The lower court dismissed both allegations concluding that they did not satisfy the standards for hearsay information announced in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509,

12 L.Ed.2d 723 (1964) and *Spinelli v. United States, supra.*
*Aguilar* requires that when an affidavit is based on hearsay
information, the magistrate must be informed of (1) some of
the underlying circumstances from which the informant
concluded that the contraband was where he claimed they
were, and (2) some of the underlying circumstances from
which the officer concluded that the informant was reliable.
*Spinelli* allows the magistrate to look to other allegations in
the affidavit for corroboration if the tip is inadequate under
either of the prongs of the *Aguilar* analysis. The tip plus
corroboration must then be deemed as trustworthy as a tip
which could pass the *Aguilar* standards without corrobora-
tion.

We note that even if we were to accept the lower
court's conclusion that the informants' tips do not satisfy the
*Aguilar–Spinelli* standards, their inclusion in the affidavit
would not in itself invalidate the warrant if the affidavit
contains other information sufficient to establish probable
cause. *Cf. Commonwealth v. Knowles*, 459 Pa. 70, 327 A.2d
19 (1974), *Commonwealth v. Tucker*, 252 Pa.Super. 594, 384
A.2d 938 (1978) (Inclusion of illegally obtained or false
evidence in affidavit does not vitiate warrant which is based
on other information that is valid and sufficient to consti-
tute probable cause). Moreover, *Spinelli* would permit a
magistrate to consider any informants' tip contained in an
affidavit whether it met its standards or not. The Supreme
Court simply held that a tip which does not meet its stan-
dards may not be permitted to raise the remaining, other-
wise insufficient allegations, to the level of probable cause.
We conclude from our common sense reading of the remain-
ing allegations in the instant affidavit that they are suffi-
cient in themselves to establish probable cause. Summing
up, we find that the affidavit in the instant case was
sufficient to justify the issuance of the warrant.

The lower court's suppression order also resulted in the
exclusion of inculpatory statements made by appellant Scar-
lata to a state police trooper outside a suppression hearing
courtroom. State police trooper Raab testified that he was

sequestered from the hearing and was sitting in the hallway outside the courtroom when Scarlata exited the courtroom and went to the restroom. On his return to the courtroom, Scarlata approached Trooper Raab and asked him if he was a state policeman. Trooper Raab claimed that he replied "yes" and did not say anything else. (R.R. at 345a). Trooper Raab stated that Scarlata began speaking to him and he testified that Scarlata,

"proceeded to relate to me that this is crazy because the lawyers and the judge just keep arguing with each other and he feels that he is being neglected.

"My reply to this was—to Mr. Scarlata—was that the suppression hearing is a technical matter and that the suppression hearing is only to ascertain that the law was abided by in obtaining and executing the warrant, not to determine whether the Defendant is guilty or not guilty.

"Mr. Scarlata then related to me that it doesn't matter how the stuff got into my house or where it came from. The thing is that you guys caught me with it and I am guilty and you can't change that.

"I did not say anything to him right away. I waited a few seconds and then I said that the chemist related to me that the hash oil was the best he ever seen.

"Scarlata answered me by saying that it was called honey, and it was the best.

"After that answer I then told Scarlata that the Hawaiian marijuana was really potent stuff because the chemist related that it had resin all over it.

"Scarlata related to me that it was like eating hamburger or steak. If you are going to do it, do it right.

Q. Then what happened, sir?

A. Well, I believe right after that Scarlata entered back into the courtroom.

(R.R. at 345a–46a).

The lower court found that

Trooper Raab was well aware of what he was doing from the outset of the discussion with Scarlata and, in essence, Raab enticed Scarlata to incriminate himself. At some

point, Raab had a duty to terminate the discussion, or, at the very least, Scarlata should have been warned that he was incriminating himself.

(Lower court opinion at 13) (citations omitted).

■ The Commonwealth contends that Trooper Raab had no duty to stop Scarlata or warn him of his constitutional rights because Scarlata was not in his custody and his statements were voluntarily given. We agree.

■ In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the Supreme Court stated that

the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

----

[4] This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

*Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706.

Under *Miranda*, the duty to inform a suspect of his rights begins when custodial interrogation begins. The test for custodial interrogation is " 'whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action is restricted by such interrogation.' " *Commonwealth v. Brown*, 473 Pa. 562, 570, 375 A.2d 1260,

1264 (1977) (citations omitted), *quoting from, Commonwealth v. O'Shea*, 456 Pa. 288, 292, 318 A.2d 713, 715, cert. denied, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974) (emphasis deleted). In the instant case, Scarlata approached Trooper Raab on his own accord and began conversing with him. When Scarlata was finished speaking with Trooper Raab, he reentered the courtroom. Clearly, Scarlata was not deprived of his freedom in any significant way and he was not placed in a situation in which he reasonably believed that his freedom was restricted by his conversation with Trooper Raab. Consequently, Trooper Raab had no duty to inform Scarlata of his rights and the lower court erred in suppression Scarlata's statements.

Accordingly, we reverse the trial court's suppression of the evidence seized at 309 East Springfield Road in Springfield Township, Pennsylvania and Scarlata's statements to Trooper Raab.

The suppression order of the court below is reversed and the case remanded for trial.